UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALFRED VIGORITO, ET AL., :
    Plaintiffs, :
                                         : Case No. 04cv1505 (JBA)
v. :
                                         :
UBS PAINEWEBBER, INC., :
    Defendant. :

## RULING [DOCS. ## 48, 52, 53]

Before the Court are the Motion to Vacate Arbitration Award [Doc. # 53] by plaintiffs Alfred, Linda, and Michael Vigorito and the Motion to Confirm Arbitration Award and to Dismiss All Claims [Docs. ## 48, 52] by defendant UBS PaineWebber, Inc. ("PaineWebber"). This diversity case[1] challenges plaintiff's adverse outcome in arbitration of their claim that PaineWebber mismanaged their stock portfolio, causing them grave financial and emotional distress. For the following reasons, plaintiffs' Motion to Vacate [Doc. # 53] is denied and defendant's Motion to Confirm and Dismiss [Docs. ## 48, 52] is granted.

I. **Factual Background**

In 1983, Fred and Linda Vigorito entered into a contract with PaineWebber for the management of their investments and for retirement planning by their broker Vincent Naclerio (Am.

---

[1] Although the Federal Arbitration Act creates federal substantive law, it does not confer subject matter jurisdiction on the federal courts. See Greenberg v. Bear Stearns & Co., 220 F.3d 22, 25 (2d Cir. 2000).

1

Statement of Claim, Def. Mot. to Confirm Ex. D [Doc. #50], ¶ 8 et seq.). From 1995 to 2002, the period central to the dispute, between 88% and 95% of the Vigoritos' investment portfolio consisted of WorldCom stock. (Id. at 3-4.)

In 1995, anticipating his retirement, Fred Vigorito reassessed his financial situation and objectives with Naclerio, and after retiring in April 1996, he signed a Program Agreement designating his primary "investment objective" as "growth" over a five-year-plus period; Mrs. Vigorito did the same when she retired in 1999. (ACCESS Program Agreements, Def. Mot. to Confirm. Ex. C [Doc. #50].) During this time, the Vigoritos were also concerned about providing for their two sons: Michael, who was attending an expensive private university, and Matt, a teenager with Down Syndrome who was struggling in school. (Am. Statement of Claim, Def. Mot. to Confirm Ex. D [Doc. #50], ¶ 8.)

Despite plaintiffs' changed priorities based on the cessation of household income flow by June 1999, Naclerio did not diversify their investments. (Id. ¶¶ 10-14.) Thus, when the price of WorldCom stock began dropping in 1999-2000, plaintiffs began to fret, and Fred Vigorito scheduled a meeting with Naclerio, Manager Hugh McIlrevey, and Accountant Kathleen Welliver in August 2001, at which he expressed his dissatisfaction with the firm's management of his investments. He felt that they were not responsive to his concerns. (Id. ¶¶

18, 25-29, 30.)

Fred Vigorito then wrote a letter of complaint to McIlverey demanding compensation. Although McIlverey assured him that someone from PaineWebber would respond, no one ever did. (Id. ¶¶ 31.) The Vigoritos ended their relationship with the firm in May 2002 (id. ¶ 35) and submitted their Statement of Claim to the NYSE for arbitration in accordance with the mandatory arbitration clause in their individual contracts with PaineWebber (see, e.g., ACCESS Program Agreements, Def. Mot. to Confirm. Ex. C [Doc. #50]) on June 12, 2002 (Submission Agreement, Def. Mot. to Confirm Ex. F). Their Amended Statement of Claim, dated January 27, 2003, alleged: breach of contract, negligence, breach of duty, common law fraud, violations of federal and state securities laws, breach of fiduciary duty, deceptive trade practices, and violations of the National Association of Securities Dealers, Inc. ("NASD") and the New York Stock Exchange, Inc. ("NYSE") rules and regulations. (Am. Statement of Claim, Def. Mot. to Confirm Ex. D [Doc. #50], ¶38.)

The arbitration was held pursuant to NYSE Rule 607 before two professional and one industry arbitrator: James K. Harragan (professional), Lewis Kurlantzick (professional), and Roland E. Miller (industry). (NYSE Rules & Letters, Pls. Mot to Vacate [Doc. # 54-6] at 3-4, & Exs. N & O [Docs. ##54-23, 54-24].) Decision was rendered on July 15, 2004 with Kurlantzick

3

dissenting:

> Decision: The undersigned arbitrator(s) have decided and determined that in full and final settlement of all claims between the parties that:
> the claims of the claimants be and hereby are dismissed in all respects; that respondent shall pay claimants $32,893 as a return of costs and filing fees; that the forum fees $16,000 are assessed against respondent; that the costs of claimants' two pre-hearing conferences (12/8/03 & 1/9/04) are assessed against claimants and the costs of respondent's one pre-hearing conference (1/9/04) are assessed against respondent.

(Def. Mot. to Confirm Ex. A.)

The arbitrators were appointed through the "list selection" method, which randomly assigns arbitrators and allows each party to exercise one peremptory challenge to the appointed arbitrators. (Id. at 4.) All arbitrators registered with the NYSE are required under NYSE Rule 610[2] to keep current biographical information on file with respect to any personal conflicts of interest or circumstances which would could affect or give the appearance of affecting impartiality. (Id. at 5.) Prior to the swearing-in of arbitrators for a panel, the NYSE Director of Arbitration can remove an arbitrator for possible

---

[2] "Each arbitrator shall disclose: (1) Any direct or indirect financial or personal interest in the outcome of the arbitration; (2) Any existing or past financial, business, professional, family or social relationships that are likely to affect impartiality or might reasonably create an appearance of partiality or bias . . . (c) The obligation to disclose . . . is a continuing duty that requires a person who accepts appointment as an arbitrator to disclose, at any stage of the arbitration, any such interests, relationships, or circumstances that arise, or are recalled or discovered." NYSE Rule 610(a), (c).

4

bias, partiality, or misconduct.[3]  (Id. at 6.)

On the first day of this arbitration, just after the arbitrators were sworn in, the following disclosure was made on the record:

> MS. KUPERSMITH (NYSE Director of Arbitration): . . . I think those are the only procedural things I have with the exception of a quick disclosure on behalf of Mr. Miller.
> Why don't you go ahead?
>
> MR. MILLER: Sure.  Since this has started, within the past two months or so my youngest son, who lives out in California as a full-time student, has become employed, part time, by UBS,[4] as a data entry clerk.  I don't see any conflict of interest from my standpoint.  I wanted you to be aware of it.  If anybody has questions for me on it, I will take it.
>
> MR. DAVIDSON (counsel for UBS): He is not a member of your household?
>
> MR. MILLER: No.
>
> MS. STONEMAN (counsel for plaintiffs): I guess we are the ones that if anybody had a concern it would be us.  I want to make sure you wouldn't have any compunction rendering an award against PaineWebber, the firm where your son is now employed.
>
> MR. MILLER: Correct.
>
> MS. STONEMAN: As long as you are comfortable with that--
>
> MR. MILLER: I have no problem.

---

[3] "Prior to the commencement of the first hearing session, the Director of Arbitration may remove an arbitrator based on information disclosed pursuant to this section."  NYSE Rule 610(d).

[4] UBS is part of PaineWebber.

5

MS. STONEMAN: Then we don't have any problems.
(Jan. 13, 2004 Hrg. Tr. at 9-10.)

Arbitration counsel for plaintiffs represents in her affidavit that she did not object to Miller because: 1) she understood the disclosure as meaning that Miller's son was a student working a part-time, low-level job at UBS; 2) she knew that only voluntary recusal was possible at the post-oath stage and did not want to offend Miller; 3) she did not want to further delay proceedings and increase the costs to her clients. (Stoneman Aff. ¶¶ 14, 15 [Doc. #54-4], Pls. Mot. to Vacate.)

On the penultimate day of the arbitration proceedings, Stoneman answered affirmatively when Harragan asked generally whether everyone "fe[lt] comfortable about having [an] opportunity to express what it is that [they] want[ed] to express within parameters." (July 8, 2004 Hrg. Tr. 1107-08.) On the final day, at the conclusion of the arbitration proceeding, Harragan questioned plaintiffs: "And you feel Mr. Vigorito and Linda and Mark, do you feel you had a good opportunity to present your side of the case?" (July 9, 2004 Hrg. Tr. at 1329.) They nodded affirmatively.[5]

---

[5] Attorney Stoneman stated in her affidavit with respect to the last day of the hearings: "As is routine at the conclusion of NYSE or NASD arbitration hearings, the parties were asked whether or not they were provided a fair hearing. I typically respond affirmatively, however, in this instance, I avoided answering the question in light of Mr. Miller's untimely disclosure. . ." (Stoneman Aff. ¶ 20 [Doc. #54-4], Pls. Mot. to Vacate).

6

Plaintiffs now move to vacate the award on the grounds that 1) Arbitrator Miller was evidently partial; and 2) that the fee assessment demonstrates that the award was in manifest disregard of the law. Defendant maintains that the award was not defective and that confirmation is therefore proper.

## II. Standard

The Supreme Court has held that "courts play only a limited role when asked to review the decision of an arbitrator." United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36, (1987). "[I]f there is a barely colorable justification for the outcome reached," then the Court may not vacate the decision, and "[t]he party seeking vacatur 'bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law.'" Nicholls v. Brookdale Univ. Hosp. & Med. Ctr., No. 05-4473-cv, 2006 U.S. App. LEXIS 26152, at *7-8 (2d Cir. Oct. 18, 2006). Among the grounds for vacatur of an arbitration award are evident partiality or corruption, 9 U.S.C. § 10, and manifest disregard of the law, Hoeft v. MVL Group, Inc., 343 F.3d 57, 64 (2d Cir. 2003).

## III. Discussion

### A. Evident partiality

At oral argument held on February 16, 2007, both counsel agreed that arbitrator Miller improperly failed to timely disclose his son's employment at UBS as required by the NYSe

7

Rules, particularly before taking the oath at the arbitration hearing. The affidavit of plaintiffs' expert Clemente opined that such disclosure could have justified removal; at minimum, Miller's disclosure was unduly belated. The issue then is whether plaintiffs have demonstrated that the nature of Miller's disclosure was materially erroneous such that Attorney Stoneman would have objected on that first day had she known the true facts, thus constituting an exception to the waiver rule.[6]

### 1. Disclosure

Plaintiffs argue that Miller acted with evident partiality in violation of FAA § 10(a)(2) by knowing of his son's employment prior to the arbitration but failing to make a timely disclosure of a conflict of interest and "couch[ing] [his] disclosure in terms that tended to minimize or trivialize the significance of the potential conflict," which was later revealed to be "incomplete, false, and/or misleading" (Pls. Reply Br. at 3) in contravention of NYSE Rule 610. Defendant maintains that plaintiff has offered no evidence of when Miller had knowledge about his son's employment at UBS and that Miller's disclosure was not a misrepresentation because his son was working part-time at UBS from August 1, 2003 until the time of disclosure.

---

[6] The Court views plaintiffs' observation that Miller fell asleep during Stoneman's closing argument as not bearing meaningfully on the issue of evident partiality, since it could have had many causes.

8

A plurality of the Supreme Court in <u>Commonwealth Coatings Corp. v. Continental Casualty Co.</u>, 393 U.S. 145 (1968), astutely noted, "we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts," <u>id.</u> at 149. This echoed the Supreme Court's cautious approach to securities arbitration in <u>Wilko v. Swan</u>, 346 U.S. 427 (1953).

Subsequently, <u>Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Ben. Funds</u>, 748 F.2d 79 (2d Cir. 1984), and <u>Shearson/American Express, Inc. v. McMahon</u>, 482 U.S. 220 (1987), manifested greater confidence in the arbitration model. <u>McMahon</u> enforced a pre-dispute arbitration agreement similar to that which it had invalidated in <u>Wilko</u>. In <u>Morelite</u>, the Second Circuit recognized a necessary "trade-off between expertise and impartiality" in the specialized panel arbitration context, holding that "evident partiality" in Section 10(b) "require[s] a showing of something more than the mere 'appearance of bias' to vacate an arbitration award," <u>Morelite Constr. Corp.</u>, 748 F.2d at 83-84.

<u>Morelite</u> established a reasonable person test for evaluating evident partiality, <u>i.e.</u>, whether a reasonable person would conclude that the arbitrator acted with partiality. Vacatur was granted in <u>Morelite</u> where an arbitrator's father was the

9

president of the umbrella union whose district union was party to the arbitration. Following <u>Morelite</u>, Judge Leisure in <u>Sanford Home for Adults v. Local 6, IFHP</u>, 665 F. Supp. 312 (S.D.N.Y. 1987), proposed a useful three-part test for evaluating the partiality of an arbitrator: "(1) the financial interest the arbitrator has in the proceeding; (2) the directness of the alleged relationship between the arbitrator and a party to the arbitration proceeding; (3) and the timing of the relationship with respect to the arbitration proceeding." <u>Id.</u> at 320.

While plaintiffs offer no evidence showing when Miller knew about his son's employment at UBS, it is clear that he knew about it before taking the oath at the PaineWebber arbitration, yet failed to make the disclosure beforehand. At the very least, Miller informed Kupersmith that he had something "quick" to disclose. The fact that she took no steps to remove him or to further investigate his disclosure before administering his oath and losing her removal authority does not permit determination of whether she was advised of the substance of the disclosure, or that she was so advised but deemed it inconsequential. Plaintiffs have produced some evidence that Miller's disclosure was inaccurate as to his son's length of employment at UBS, but neither Miller nor his son have been shown to have had any financial interest in the proceeding. Employment records show that his son was a part-time, lower-level worker at UBS. While

10

plaintiffs hypothesize that Miller's son's problematic employment and education history implicates Miller's desire to curry favor with PaineWebber to advance his son's career, this is speculation unsupported by competent evidence.  In sum, the Sanford factors do not favor vacatur, and using the Morelite standard, reasonable people would not conclude from these facts of belated and inaccurate disclosure that Miller was evidently partial to PaineWebber.

This case is distinguishable from Sanko S.S. Co. v. Cook Indus., 495 F.2d 1260 (2d Cir. 1973), despite the similarity urged by plaintiffs.  In Sanko, the Second Circuit remanded the arbitration decision for an evidentiary hearing where the arbitrator's relationship with a party was potentially significantly stronger than here, and where the arbitrator had earlier described their business connection as "of a spot nature" but it later emerged that there might have been a continuing business relationship and that the party's counsel formerly represented the arbitrator's employer in an unrelated matter.  By contrast, Miller's tardy disclosure, while somewhat inaccurate has not been shown to have been materially incomplete such that Attorney Stoneman instead would have objected to Miller's continued participation.[7]

---

[7] Stoneman stated that her acquiescence was contingent on her "interpret[ation of] Mr. Miller's disclosure to mean that his youngest son was primarily a student and that his part-time

11

**2. Waiver**

Because Miller's disclosure was not materially defective, the Court has no basis for departure from "[t]he settled law of this circuit preclud[ing] attacks on the qualifications of arbitrators on grounds previously known but not raised until after an award has been rendered." AAOT Foreign Econ. Assoc. v. Int'l Dev. and Trade Servs., Inc., 139 F.3d 980, 982 (2d Cir. 1998). Indeed, a disgruntled party cannot object after an award has been made . . . where the party has actual knowledge of the facts that form the basis of the objection." Morelite, 748 F.2d at 84 n.5.

Plaintiff's counsel was a seasoned arbitrator and attorney in the securities field, and waived objection to Miller as arbitrator when she responded to his disclosure. Even though the Director of Arbitration was precluded from removing Miller after his oath was taken, Attorney Stoneman nonetheless had the opportunity to object, and she instead put Miller on notice of what was expected of him by pointedly asking him whether he could make a decision adverse to PaineWebber under the circumstances, a reasonable decision made out of concern for the substantial temporal and monetary costs that her client would have to further incur, but nonetheless a choice since her responsibility was to

---

employment with PaineWebber was not significant" (Stoneman Aff. ¶ 16), which again, appears to have been materially true.

12

make any objection when the disclosure was made.  No grounds have been presented for an exception to the waiver rule in this case.

The Court appreciates plaintiffs' disillusionment with what they perceive to have been a flawed mandatory arbitration hearing.  At oral argument, plaintiff's counsel represented that the Vigoritos did not feel welcome in or well-served by the mandatory industry arbitration setting, a sentiment exacerbated by Miller's failure to timely disclose his son's employment with UBS and continuation on the panel.  This conduct cast a shadow over the finality of this arbitration proceeding and the plaintiffs' confidence in the fairness of its outcome, particularly where there is no explanation given for the arbitration decision (or dissent).[8]

Nonetheless, for the reasons reviewed above, vacatur will not be granted on grounds of evident partiality in this case.

### B. Manifest disregard of law

Plaintiffs advance the position that because the arbitrators award to them of litigation costs, "require[s] that the panel make a finding that the plaintiffs were the prevailing party," and thus there was a "fundamental disconnect within the award itself," constituting "one of the recognized grounds for invoking the doctrine of manifest disregard of law."  (Pls. Mem. at 4.)

---

[8] See, e.g., Jennifer J. Johnson, Wall Street Meets the Wild West: Bringing Law and Order to Securities Arbitration, 84 N.C. L. Rev. 123 (2005).

13

They focus on Professor Kurlantzick's dissent from the decision, although the decision gives no grounds for his dissent.

Defendant in contrast argues that by this award it is its ox which was gored, not plaintiff's, since defendant prevailed on the judgment but still was directed to pay arbitration costs, but views NYSE Rule 629(c) as affording discretion to arbitrators.

"A court will vacate an arbitral award on th[e] ground [of manifest disregard of the law] only if 'a reviewing court . . . find[s] both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.'" Banco de Seguros del Estado v. Mut. Marine Office, Inc., 344 F.3d 255, 263 (2d Cir. 2003) (citing Greenberg v. Bear, Stearns & Co., 220 F.3d 22, 28 (2d Cir. 2000)).

Plaintiffs rely on DeGaetano v. Smith Barney, Inc., 983 F. Supp. 459 (S.D.N.Y. 1997), in which an employment sex discrimination arbitration award ordering each side to bear its own attorney's fees was vacated based on manifest disregard of law on fee allocation. Yet plaintiffs overlook the distinguishing difference of DeGaetano, which is that under Title VII, fees and costs may be awarded to the prevailing party, 42 U.S.C. § 2000e-5(k). Because this provision had been manifestly disregarded by the award directing the prevailing plaintiff to

shoulder her own costs, "[t]he error [was] obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator," id. at 462 (quoting DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 821 (2d Cir. 1997)).

NYSE Rule 629(c)(2) provides: "In addition to forum fees, the arbitrator(s) may determine in the award the amount of costs incurred . . . and, unless applicable law directs otherwise, other costs and expenses of the parties. The arbitrator(s) shall determine by whom such costs shall be borne." (emphasis added). Thus, in the absence of statutory directives such as are provided under Title VII, arbitrators have discretion in NYSE cases to award costs and fees. Even though plaintiffs contend that established practice is to award costs and fees to the prevailing party, they point to no applicable law or legal principle disregarded by the arbitrators in exercising their discretion — other than the default "American rule" that each party bears its own costs in litigation, which does not constitute established law warranting vacatur.

The Court will not grant vacatur based on manifest disregard of the law in this case.

## IV. Conclusion

Accordingly, plaintiffs' Motion to Vacate [Doc. #53] is DENIED, and defendant's Motion to Confirm/Dismiss All Counts

15

[Docs. ##48, 52] is GRANTED.  The Clerk is directed to CLOSE this case.

IT IS SO ORDERED.

/s/
_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 13th day of March, 2007.**