UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALFRED VIGORITO, LINDA VIGORITO, and
MARK VIGORITO,
    *Plaintiffs*,

v.                              No. 04-cv-1505 (JBA)

UBS PAINEWEBBER, INC.,
    *Defendant*.

**RULING ON PLAINTIFFS' MOTION FOR RECONSIDERATION**

Plaintiffs Alfred, Linda, and Mark Vigorito brought this action in 2004, seeking vacatur of an unfavorable decision rendered against them by a New York Stock Exchange (NYSE) arbitration panel in their dispute with UBS PaineWebber, Inc. The Court denied their motion to vacate on March 13, 2007 [Doc. # 67], and the Vigoritos subsequently moved for reconsideration of that decision [Doc. # 69], which the Court granted for the purpose of reconsideration in light of *Applied Industrial Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132 (2d Cir. 2007). After review of the parties' briefing, the Court concludes that this intervening decision does not affect the previous ruling denying plaintiffs' motion to vacate and it will remain unchanged.

**I.    Facts and background**

Familiarity with the facts underlying the Vigoritos' dispute with the defendant

will be presumed from the Court's earlier ruling on the parties' cross-motions to vacate and confirm the award, *Vigorito v. UBS PaineWebber, Inc.*, 477 F. Supp. 2d 481 (D. Conn. 2007). A few details bear explication for purposes of determining whether *Applied Industrial Materials Corp.* affects this arbitration award.

Following the Vigoritos' filing of their Statement of Claim against PaineWebber with the New York Stock Exchange (NYSE), the parties selected a panel of arbitrators in accordance with the NYSE's procedures. The panel's composition was finalized in December 2002, and consisted of James Harragan, Lewis Kurlantzick, and Ronald Miller. The first two arbitrators were "public" arbitrators with no connection to the securities industry, and Miller was an "industry" arbitrator who had relevant securities experience.[1] As part of his NYSE profile, Miller was required to disclose the "Brokerage Firms with whom" Miller, his employer, or his family "have or have had a relationship within the last five years."[2] In response, Miller listed "Charles Schwab (son Keith Miller works for in CA)."[3] From the December 2002 selection of the arbitrators to the opening minutes of the arbitration hearing on January 13, 2004, Miller made no further disclosures to the NYSE or the parties regarding his son's employment.[4]

At the commencement of the arbitration hearing, however, after NYSE Arbitration Counsel Karen Kupersmith set out procedural details regarding the conduct

---

[1] Pl.'s Mot. to Vacate, Ex. O (Doc. # 54-24) (NYSE profile detailing Miller's employment history).

[2] *Id.*

[3] *Id.*

[4] Tracy Pride Stoneman Aff. (Doc. # 54-4) at ¶ 12.

of the hearing, she concluded by noting that "those are the only procedural things I have with the exception of a quick disclosure on behalf of Mr. Miller,"[5] who made the following statement:

> Since this has started, within the past two months or so my youngest son, who lives out in California as a full-time student, has become employed, part time, by UBS, as a data entry clerk. I don't see any conflict of interest from my standpoint. I wanted you to be aware of it. If anyone has questions for me on it, I will take it.[6]

Miller did not offer to recuse himself, and there was a colloquy between Miller and counsel for the parties. In its entirety, it consisted of the following exchange:

> [UBS PaineWebber]: He is not a member of your household?
>
> Mr. Miller: No.
>
> [Vigoritos' Counsel]: I guess we are the ones that if anybody had a concern it would be us. I want to make sure you wouldn't have any compunction rendering an award against PaineWebber, the firm where you son is now employed.
>
> Mr. Miller: Correct.
>
> [Vigoritos' Counsel]: As long as you are comfortable with that –
>
> Mr. Miller: I have no problem.
>
> [Vigoritos' Counsel]: Then we don't have any problems.[7]

On July 15, 2004, the arbitration panel issued a decision dismissing all of the

---

[5] Jan. 13, 2004 Hearing Tr. at 9:3-6.

[6] *Id.* at 9:8-17.

[7] *Id.* at 9:18-10:7.

Vigoritos' claims, but awarding the Vigoritos $32,893 in costs and fees.[8] Arbitrators Miller and Harragan voted for the award, but Kurlantzick dissented, thus Miller's vote was critical to the arbitration outcome. There is no written explanation of reasons for the decision or the dissent.

In their motion to vacate the award, the plaintiffs attacked the NYSE panel's decision on two grounds: first, that arbitrator Miller should have been removed from the panel, and second, that the panel's decision to dismiss the Vigoritos' claims but nonetheless award them costs and fees signified that the decision was rendered in manifest disregard of the law. This Court denied the Vigoritos' motion to vacate and granted UBS PaineWebber's motion to confirm the award on the grounds, in relevant part, that (a) Miller's conduct did not rise to the level of evident partiality required by the Federal Arbitration Act, 9 U.S.C. § 10(a)(2) as interpreted by *Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79 (2d Cir. 1984), and (b) plaintiffs' counsel waived objection to Miller's continued participation on the arbitration panel. *Vigorito*, 477 F. Supp. 2d at 486-487.

II. **Whether a different result is required by *Applied Industrial Materials***

The parties have helpfully briefed their views of the Second Circuit's decision in *Applied Industrial Materials*, 492 F.3d at 132, rendered during the pendency of the motion for reconsideration. In that case, two commercial entities ("Applied Industrial"

---

[8] *See* Pl.'s Mot. to Vacate, Ex. H (Doc. # 54-14).

4

and "Ovalar") who were engaged in a joint petroleum coke transport and distribution enterprise invoked an arbitration proceeding to resolve a dispute over profits. In accordance with the agreed-upon rules, each side selected a single arbitrator, and then jointly selected a third arbitrator to preside over the panel, provided that no arbitrator "'who has or has had a financial or personal interest in the outcome of the arbitration or has acquired from an interested source detailed prior knowledge of the matter in dispute'" was permitted to serve. *Id.* at 135. The presiding arbitrator chosen, Charles Fabrikant, was the chief executive officer of Seacor Holdings, a multi-billion dollar corporation with many divisions. Before the arbitration hearing began and before the arbitrators were to submit conflict disclosure statements, the arbitrators were told that one of the parties, Applied Industrial, was being sold to Oxbow Industries, a transaction which Applied Industrial indicated may have been relevant to disclosures. Nonetheless, Fabrikant's statement represented that he had no conflicts. Some seven months later, after the arbitration hearing began, Fabrikant emailed the parties to inform them that it had come to his attention that one of Seacor's subsidiaries was in negotiations with Oxbow regarding a contract for the transport of petroleum coke, but that Fabrikant was not involved in the discussions and did not plan to become so. The parties did not object to Fabrikant's continued participation until after the panel rendered its decision in favor of Applied Industrial on the question of liability.

Following its own investigation, Ovalar requested that Fabrikant withdraw, on the basis that his company Seacor had been transacting business with Oxbow for some years

prior to the arbitration. Fabrikant declined to withdraw, but in so doing revealed that his knowledge of a potential conflict had arisen earlier than he had previously revealed, but that

> he had told Seacor's president "that he wished to know nothing about [Seacor]'s conversations, or be a party to information about our activities with Oxbow or be consulted concerning any business with them." Having erected a so-called "Chinese wall" to prevent his learning of any agreements between his company and Oxbow, Fabrikant concluded that he was unaware of the relationship until he received the letter from Ovalar.

*Id.* at 136. Thus, Fabrikant had knowledge of a potential conflict early in the arbitration process, but had neither revealed his knowledge of Seacor's business with Oxbow to the parties nor told the parties of the "Chinese wall" arrangement which he had put in place. The Second Circuit affirmed the district court's vacatur of the arbitration decision adverse to Olavar, and clarified that *Morelite* requires arbitrators to "take steps to ensure that the parties are not misled into believing that no nontrivial conflict exists" by investigating non-trivial conflicts of interest which come to the arbitrator's attention or disclosing the reasons "for believing there might be a conflict and [the arbitrator's] intention not to investigate." *Id.* at 138. Fabrikant's behavior, the court held, would cause a reasonable observer to "be given pause" by his omissions, and to conclude from the omissions "that evident partiality existed." *Id.* at 139. Further, although Applied Industrial urged that Olavar had waived any objection to Fabrikant's partiality following his first disclosure of the single potential Seacor-Oxbow contract by remaining silent, the court of appeals found that argument to be "without merit," *id.* at 139 n.2, quoting

Morelite's admonition that the rule against objecting to an arbitrator's partiality after an award has been made "applies only where the party has actual knowledge of the facts that form the basis of the objection." *Morelite*, 748 F.2d at 84 n.5 (internal citation omitted).

Here, Arbitrator Miller's behavior calls to mind the missteps of Fabrikant: while bound by a continuing duty to apprise the parties of conflicts, Miller did not do so. Although Miller raised no conflicts during the selection of the arbitration panel, he became aware of his son's employment with PaineWebber after being selected as an arbitrator and prior to the commencement of the hearing. His conduct echoes that of Fabrikant's: despite knowing of at least an appearance of conflict prior to the hearing, Miller said nothing until after the panel was sworn in and had conducted no investigation into the details of his son's employment with the defendant, nor advised that he intended not to do so. From such omissions, evident partiality could be found.[9]

However, even if the Court were to conclude that Miller's conduct constituted evident partiality, the issue of the plaintiffs' waiver remains. The Vigoritos claim that their knowledge of Miller's conflict revealed in the final moments before the arbitration hearing began was insufficient because Miller misrepresented the length and terms of his son's employment with PaineWebber and in the securities industry generally, and therefore could not have constituted "actual knowledge of the facts that form the basis of the objection," *Morelite*, 748 F.2d at 84 n.5, such that any effective waiver occurred.

Even though Miller misrepresented the details of his son's employment with

---

[9] *See* Jan. 13, 2004 Hearing Tr. at 9:3-6.

PaineWebber, Attorney Stoneman was squarely informed of his conflict (even if Miller did not recognize it as such), a conflict which the plaintiffs' briefing termed "the gold standard" of arbitrator bias, namely, the father-son relationship between Miller and an employee of the defendant.[10] Had Miller failed to disclose his son's employment by a party to an arbitration in which he was an arbitrator, the plaintiffs clearly would have had no knowledge on which to object. Indeed, while the existence of this relationship, paired with Miller's late and perfunctory disclosure of its existence, could suggest evident partiality, Attorney Stoneman never asked Miller to recuse himself or otherwise attempted to preserve her objection to either the late conflict disclosure or the conflict itself, and instead expressly and readily assented to Miller's continued participation on the panel. Plaintiffs' counsel's brief inquiry of Miller[11] did not seek any of the details of Keith Miller's employment which the plaintiffs now identify in their reconsideration briefing as necessary to have lodged an objection to Miller: dates of employ, pay rate, licensure, or past employment in the securities industry.

This additional information about Keith Miller's employment which came to light in discovery permitted by this Court – that the younger Miller at one time was employed by his father's securities firm, and that he worked for PaineWebber in a more substantial capacity than that described by Arbitrator Miller in his belated disclosure. The plaintiffs

---

[10] *See* Pl.'s Supp. Memo [Doc. # 77] at 22.

[11] Attorney Stoneman appears to have engaged in a substantially longer colloquy with the panel over witness sequestration than on Miller's disclosure. *Compare* Jan. 13, 2004 Hearing Tr. at 9:18-10:7 (discussing Miller's disclosure) *with id.* at 10:21-13:17 (discussing the presence of witnesses).

do not explain, however, how these additional details materially altered the single salient fact provided by Miller's disclosure that was necessary to form an objection to Miller's participation: that Miller's son worked for the defendant. In other words, knowing nothing more of Keith Miller's employment circumstances than Attorney Stoneman did by virtue of Miller's terse disclosure, the plaintiffs were in a position to object to Miller's participation and their waiver of objections to Miller was not ineffective for lack of timely and sufficient knowledge.

To the extent that the Vigoritos explain their counsel's decision to stay silent and not request Miller's recusal as a reluctant response to an awkward, uncomfortable situation not of their making, Second Circuit authority counsels the same result nonetheless. *E.g., Pike v. Freeman*, 266 F.3d 78, 90 (2d Cir. 2001) (prohibiting "collateral attacks on an arbitration procedure on grounds not raised before the arbitrators") (internal quotation omitted). To give the waiver no effect and to permit the conflict to be raised for the first time after the adverse decision is rendered creates the "'[h]eads I win, tails you lose'" dilemma which the Second Circuit has explicitly warned of: a party to arbitration cannot waive an objection, staying silent hoping for a favorable outcome, and then lodge the objection in a motion to vacate when the arbitration ends adversely to it. *AAOT Foreign Economic Assoc. Technostroyexport v. Int'l Development and Trade Servs., Inc.*, 139 F.3d 980, 982 (2d Cir. 1998).

While this result does not excuse the impropriety of Miller sitting on this arbitration after failing to timely notify the parties of his son's employment with the

defendant, having failed to accurately ascertain the details of his employment, and failing to recognize his conflicted circumstance in the first place, the plaintiffs waived the conflict of which they had knowledge – that Miller's son was employed by defendant. While it remains unknown whether plaintiffs' counsel or the NYSE would have acted differently if advised of this conflict sufficiently in advance of the arbitration hearing and before all the parties, witnesses and counsel were assembled to proceed, in the face of an affirmative acceptance of Miller's participation knowing his son had an employment relationship with PaineWebber, this Court will not disturb the arbitration decision.

### III.     Conclusion

For the reasons stated above, after reconsideration the Court declines to alter its ruling denying the plaintiffs' motion to vacate and granting the defendant's motion to confirm the arbitration decision.

IT IS SO ORDERED.

/s/

_____
JANET BOND ARTERTON, U.S.D.J.

Dated at New Haven, Connecticut, this 2nd day of June, 2008.